Walter J. Moore and Patricia B. Moore v. Commissioner.
Moore v. Commissioner
Docket No. 4944-66.
United States Tax Court
T.C. Memo 1968-110; 1968 Tax Ct. Memo LEXIS 189; 27 T.C.M. (CCH) 536; T.C.M. (RIA) 68110; June 10, 1968. Filed Michael M. Davis, for the petitioners. Lawrence A. Wright, for the respondent. TIETJENS
Memorandum Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax against the petitioners for the year 1962 in the amount of $1,567.93 and a negligence penalty under section 6653(a), Internal Revenue Code of 1954, of $78.40. By stipulation the parties have settled all issues except one. The only question left for decision is whether petitioner Walter J. Moore must include in his income certain "royalties" based upon sales of an English edition of a book written by him entitled "Physical Chemistry," of which "royalties" he had purportedly made a valid and completed gift in 1958 to his children. All of the facts are stipulated and they are so found. So far as pertinent to the question *190 presented, they are as follows: Petitioners Walter J. and Patricia B. Moore are husband and wife, and during the taxable year 1962 lived in Bloomington, Indiana. Petitioners filed their joint Federal income tax return for the taxable year 1962 with the district director of internal revenue for the district of Indiana. At all times material hereto, petitioners kept their accounts and filed their Federal income tax returns on the cash basis and their taxable year was the calendar year. For the years 1953 until the present, petitioner Walter J. Moore has been associated with, and a professor on the faculty of, Indiana University in the Department of Chemistry. During the year 1950, petitioner Walter J. Moore's first book, entitled "Physical Chemistry," was published in the United States by Prentice-Hall, Inc. Royalties from that book aggregated approximately $4,000 per year. The book "Physical Chemistry" was published pursuant to an agreement executed between Prentice-Hall, Inc., and petitioner Walter J. Moore on July 26, 1948. This agreement contained, among others, the following provisions: 1. The Author will immediately set about writing and preparing for publication *191 a work on the subject of: Advanced Physical Chemistry and he grants this work to the Publisher with the exclusive rights: (a) to make all translations, abridgments, and other versions thereof; (b) to copyright said work in the Publisher's name in the United States of America and in the Publisher's name or any other name in such other countries as the Publisher may determine; (c) to print, publish, and sell the work during the term of such copyrights and renewals thereof in all languages; and (d) in connection with the foregoing, to use or authorize the use of the Author's name and likeness or photograph, and the Author or his heirs, executors, or assigns will, upon the Publisher's request, do all acts necessary to effectuate this agreement. * * * 3. When the manuscript is ready for publication, it will be published at the Publisher's own expense. The Publisher will pay the Author a royalty, based on the gross proceeds from the sale of the work (the term "gross proceeds from the sale of the work" being interpreted to mean the actual cash received by the Publisher from the sale of the work, of 10% on the first 2500 copies sold; 12 1/2% on the next 2500 copies sold, and 15% on all *192 over 5000 copies sold. * * * 5. Paragraphs A-M inclusive, on pages 2 and 3 following, are parts of this agreement as though placed before the signatures. * * * I. The Publisher may permit others to publish, broadcast over the radio, make mechanical renditions and recordings, publish Book Club and micro-film editions, make translations and other versions, show or produce in theatres and motion pictures and by television, serialize, syndicate, quote, and otherwise utilize the said work, and material based on the said 537 work, without compensation to the Author or the Publisher, and may authorize the use of the Author's name in connection therewith. In the event the Publisher receives any compensation from such use by others, the net amount of such compensation shall be divided equally between the Publisher and the Author. The Publisher may in its discretion sell any overstock of the work at a reduced price, and the Author shall be paid a royalty of 10% of the gross proceeds (as defined in paragraph 3, page 1 hereof) from such sale, unless the sale shall be made below the manufacturing costs of the book plus royalties, in which case no royalties shall be paid. On the sale of *193 books and sheets outside the United States, the Publisher shall pay the Author a royalty of 10% on the amount of money received from the sale of such books and sheets. All copies of the work sold and all compensation from sales of the work under this paragraph shall be excluded in computing the royalty under paragraph 3, page 1, hereof; and the royalties or other compensation provided for in this paragraph shall be computed and shown separately from the royalty stated in paragraph 3, page 1. * * * K. The Author agrees that, during the term of this agreement, he will not contract to publish or furnish to any other publisher for sale or trade, or otherwise, any work upon the same subject that shall conflict with the sale of the work herein specified. L. This agreement shall not be subject to change, modification or discharge, in whole or in part, except by written instrument signed by the parties. M. This agreement shall be construed and interpreted according to the laws of the State of New York and shall be binding upon the parties hereto, their heirs, successors, assigns, and personal representatives; and references to the Author and the Publisher shall include their heirs, successors, *194 assigns, and personal representatives. [Emphasis supplied.] Pursuant to the rights enumerated in subparagraph I of its contract with the petitioner, Prentice-Hall, Inc., in 1954 executed a contract with Longmans, Green & Co., Ltd., for the publication of an English edition of petitioner's book. The contract between Prentice-Hall, Inc., and Longmans, Green & Co., Ltd., contained, among others, the following provisions: 1. The Proprietor [Prentice-Hall] grants to the Publisher the exclusive right to print, publish and sell the work PHYSICAL CHEMISTRY, Second Edition, by Walter J. Moore in the English language in the British Commonwealth and Empire, excluding Canada, as constituted at January 1, 1947; the rest of the world, excluding the United States of America, its dependencies, the Philippine Islands and Canada, to be an open market for copies of editions produced by both parties. * * * 3. The Proprietor guarantees to the Publisher that the said work is in no way whatever a violation or infringement of the copyright belonging to any other party and should the said work contain matter which in the opinion of the Publisher or its legal advisors may be libellous, objectionable *195 or scandalous it shall be at liberty to remove such matter. 4. The copyright in the said work shall remain the property of the Proprietor. * * * 12. All rights now existing or which hereafter come into existence and which are not specifically mentioned in this agreement are hereby reserved to and by the Proprietor. * * * 17. The Publisher shall have the sole and exclusive right to conclude arrangements for the sale of serialization, condensation, broadcasting, television, and anthology rights within the exclusive territory assigned to it and shall pay to the Proprietor 75% (seventy-five per cent) of all net monies received. 18. The Publisher agrees to make to the Proprietor the following payments in U.S. dollars: A. An advance payment of $560.00 (200 Pounds) on account of royalties, payable upon signing of this agreement. A payment of $140.00 (50 Pounds) for the right to reproduce the work by means of photo-offset. This payment shall be payable upon publication of the work. B. A royalty of 12 1/2% of the Publisher's published retail catalog price on all copies sold. C. A royalty of 10% (ten per cent) of the net actual receipts from the sale of all copies sold overseas *196 or for export except on cheaper editions, when the royalties hereinafter provided for such cheaper editions shall apply on all copies sold whether for export or otherwise. D. A royalty of 10% (ten per cent) on the published price on every copy sold that may be issued at more than two shillings (2/-), but substantially less than the original published price. E. On editions published at two shillings (2/-) a royalty of twopence on each copy shall be paid; and a pro rata scale for editions published at less than two shillings (2/-). On March 5, 1958, petitioner Walter J. Moore executed the following certificate: 538 CERTIFICATE OF GIFT OF ROYALTIES In consideration of my love and affection for them, I, Walter J. Moore, hereby give, assign and transfer to my children, Anthony Graham Moore, Julia Elizabeth Moore and Catherine Hilda Moore, in three (3) equal parts, all royalties due me as the Author under the contract between Prentice-Hall, Inc., and Longmans, Green and Co., Ltd., London, England, dated 1 June 1954, for publication and sale of the English Edition of my book "Physical Chemistry", and I hereby direct said Publishers to cause checks for the payment of said royalties *197 to be issued and mailed to said children at 2514 E. Kirkwood Avenue, Bloomington, Indiana, for all such sums as are now due me and shall become due under said contract in the future. IN WITNESS WHEREOF, I have hereunto subscribed my name at Bloomington, Indiana, this 5th day of March, 1958. /s/ Walter J. Moore Walter J. Moore Since the execution of this certificate, all "royalties" otherwise accruing to petitioner Walter J. Moore attributable to the English edition of the book have been paid by Prentice-Hall, Inc., to petitioner's children. For the taxable year 1962, the "royalty" income attributable to the English edition of petitioner Walter J. Moore's book was $952.49, which was paid to petitioner's children. The Commissioner determined that these "royalties" were includable in petitioners' gross income under section 61, I.R.C. 1954. We sustain the Commissioner's determination. Here, petitioner transferred no manuscript or literary production or copyright or royalty contract to his children. He did purport to give them a portion of his "royalties." Previous to his contract of July 26, 1948 with Prentice-Hall, Inc., no "literary property" was *198 in existence. In essence, under that contract, petitioner simply agreed to "set about writing and preparing for publication a work." The contract contemporaneously "grants this work" (not yet in existence) and "exclusive rights" to it to Prentice-Hall, Inc., in return for certain "royalties," including an equal division of compensation which might in the future be paid to Prentice-Hall, Inc., for use by others of the yet to be created book, under arrangements to be made by Prentice-Hall, Inc. Subsequently, in 1954, such arrangements were made between Prentice-Hall, Inc., and Longmans, Green & Co., Ltd. The payments which were paid by Longmans thereunder were divided between Prentice-Hall, Inc., and petitioner. In 1958 petitioner gave, assigned, and transferred his share of these payments to his children. To us this was a naked anticipatory assignment of future income by petitioner to his children. He cannot escape taxability of this income to him. The transactions did not transfer property rights in the book to the children. Petitioner had no such rights. He had already granted all of them to Prentice-Hall, Inc. All he ever had left was a right to compensation for his setting about *199 "writing and preparing for publication a work." A portion of this compensation he gave to his children. That's all there was to it. We do not think we have to decide questions of what are the consequences of how you "slice" or "cut" the tree and the fruit, whether vertically or horizontally. No matter what was sliced, or which way, it was still pure income, and nothing else. See Eustice, Lyons, "Assignment of Income: P.G. Lake and Beyond," 14th University of Southern California Tax Institute 47 (1962). We think the fundamental teachings of Helvering v. Eubank, 311 U.S. 122 (1940), and Harrison v. Schaffner, 312 U.S. 579 (1941), compel us to decide this case for the Commissioner. Decision will be entered under Rule 50.